[Crim. No. 2136. First Appellate District, Division Two.—September 19, 1940.]

In the Matter of the Petition of JEANNE BLACHE for a Writ of Habeas Corpus.

Edward J. Lynch for Petitioner.

Livingston & Livingston and Max H. Margolis for Respondent.

NOURSE, P. J.—The petitioner seeks her release under *habeas corpus* from a commitment for contempt. Petitioner's difficulties arise out of the complications of her marriage in 1919 to Maurice Blache and the claims of one Anna Blache that at the time of this marriage Maurice was her husband by virtue of a ceremony performed in 1912.

The petition alleges that Maurice Blache was born in France and had been in the United States since 1911. When the United States entered the war in 1917 he volunteered in a California regiment and was thereafter honorably discharged. He married petitioner in San Jose, California, in 1919, and they thereafter lived together as husband and wife. At the time of this marriage Maurice had no property, or income, or employment; the petitioner at that time was the owner of one apartment house in San Francisco, this being her separate property, which, about a year after the marriage, she sold.

She invested the proceeds of this sale in a business known as "Blache Film Laboratories" which she owned and operated as her separate property for several years at a considerable profit. During all this period Maurice was employed as a camera man with Pathe Films Corporation at a salary of $25 a week. Some time after entering this business the petitioner was in poor health, and, upon advice of her banker, she opened a joint bank account with Maurice in which she deposited proceeds of her business venture. This arrangement she alleges was "for the sole purpose of avoiding the expense and delay of probate proceedings or litigation in the event of her death; that petitioner at said time informed her husband, Maurice J. Blache, of the advice of said banker and that she was making said deposits in their joint names, and the said parties did then and there agree that there was to be no change in the title of said money as separate property of petitioner, and the said Maurice J. Blache agreed that at any time upon request, he would sign any order or release necessary to authorize withdrawal of the money or transfer thereof to the name of the petitioner". The petitioner further alleges: "That a few days prior to the said 26th day of May, 1939, said Maurice J. Blache informed petitioner that two attorneys from Los Angeles had come to San Francisco and were demanding that he pay over to them immediately the sum of $37,500 under threats of prosecution for bigamy and depriving the said Maurice J. Blache and his wife of all money and property owned by them, or either of them, unless such payment was made forthwith; that said Maurice J. Blache for the first time informed your petitioner that he had gone through a marriage ceremony with said Anna J. Blache in Ohio in 1912; that thereafter in 1913 said Anna J. Blache had deserted him and that he had brought an action for divorce in Los Angeles in 1915; that the default of said Anna J. Blache had been entered in said action and the case was tried and submitted, but he had since ascertained that for some reason an interlocutory decree had not been entered; that said Maurice J. Blache had not seen Anna J. Blache since she deserted him some 25 years before, but that she had known at least 8 or 9 years that Maurice J. Blache and petitioner had intermarried; that said Maurice J. Blache also informed your petitioner at said time that he was greatly in fear that the most extreme measures would be used against him by the

said attorneys from Los Angeles to force him to raise money to meet their demands and told your petitioner that she should not be involved in such proceedings, but should protect her own interests; that said Maurice J. Blache thereupon executed an order authorizing petitioner to withdraw said funds from said Anglo-California National Bank; that said Maurice J. Blache never had any right, title or interest in said money, or any part thereof, and never claimed any interest therein and does not now claim any interest therein.''

Following these threats an action was commenced by Anna J. Blache on June 6, 1939, for separate maintenance against Maurice, and petitioner was joined as a defendant on allegations that she and Maurice held community property. At a preliminary hearing the superior court awarded Anna $100 a month as alimony *pendente lite,* $350 as counsel fees, and $210 on account of costs. On October 16, 1939, the same court made an additional award on account of counsel fees of $3,150. This latter sum was not paid and Maurice was ordered to show cause why he should not be punished for contempt. At this hearing the petitioner herein appeared and was sworn as a witness for the plaintiff Anna Blache. In the course of this hearing it was disclosed that in May, 1939, there was on deposit in the joint bank account of petitioner and Maurice the sum of $15,000. This deposit represents the sum covered by the transfer from Maurice to petitioner heretofore mentioned. With this transfer the petitioner withdrew the entire sum from the bank on May 26, 1939, which was ten days before Anna commenced her action for maintenance. At about the same time Maurice conveyed to petitioner all real property standing in the joint names of petitioner and Maurice.

These contempt proceedings rest upon the petitioner's refusal to disclose the sum of $15,000 which she had withdrawn from the bank. In support of the commitment the respondent contends that the inquiry was material to the proceedings brought to compel Maurice to pay the award on account of counsel fees. The petitioner contends that the questions were not material. The record compels an agreement with petitioner.

This record is voluminous, showing day after day of arguments of counsel, charges and recriminations, interspersed with repeated conjectures and suspicions. It is difficult to

determine what is the legal evidence upon which the order of commitment is defended. We will not attempt to segregate all of the few grains of wheat from the great mass of chaff. It is sufficient to state that the witness steadfastly refused to give opposing counsel any information regarding the present location of the money involved, that she reiterated that the entire sum was her separate property, the proceeds of her separate property, that Maurice had no interest in any part of it, that she withdrew the sum from the bank at the time alleged, that she had then held it in her own possession, and that Maurice had no interest in, access to, or control over it. It should also be stated that, except for maintaining this position, her answers were not frank and in some cases appeared to be both untruthful and evasive; and herein seems to lie the reason for her commitment.

The commitment rests partially upon the opinion of the trial court that, in refusing to disclose the place where the money was kept, the petitioner committed perjury. In deference to the judgment of the trial court in this regard we are forced to conclude, as hereinbefore stated, that the order for commitment followed the trial court's belief that the witness was committing perjury, and it is left to determine whether such belief will support the order of commitment.

Perjury is itself a criminal offense denounced by section 118 of the Penal Code as applying to one who, under oath, "states as true any material matter which he knows to be false". But one charged with the crime of perjury is entitled to a trial by jury and may demand proof that the statement was false and that it was a "material matter". In this proceeding for contempt, which is also a criminal proceeding, the witness may demand proof of the falsity of the statement and may not be held on the mere suspicion of the trial court that the statement was false. Unless the statement of the witness is inherently false or is such that the court would have judicial knowledge of its falsity, it will not serve as the basis for a commitment on the ground of its falsity alone. (*People* v. *Hille*, 192 Ill. App. 139; 17 C. J. S., Contempt, sec. 24, p. 31.) There is nothing in the testimony of the petitioner which would make it appear false on the face of the record, and there is nothing which would support a conclusion that the trial court could take judicial knowledge that the testimony was false. The hearing ended in

April, 1940, and it is fairly conceivable that the particular fund, withdrawn in May, 1939, had been spent, commingled with other funds of the witness, or given away. There was no more than a suspicion that the witness was holding it intact at some safe hiding place.

 But a more serious consideration is that the entire line of questions upon which petitioner was committed was not material to the issues of the pending proceeding. It should be recalled that such proceeding was instituted by counsel for Anna to recover counsel fees of over $3,000. When the original award of alimony *pendente lite* and counsel fees had been made Maurice made payments under the order. Then, when counsel for Anna discovered that the petitioner owned real estate worth approximately $250,000 and the award of counsel fees was increased by $3,000, Maurice stopped payments and contempt proceedings against him were instituted. From the fact that he was able to make these small payments it might have been inferred that he had obtained these sums from the petitioner and that he could obtain more from the same source. But that is not the subject of the inquiry on this proceeding. On the theory that petitioner and Maurice were community owners, all the real properties owned by this petitioner were tied up by attachment or injunctive process. The title to these properties was being litigated in another proceeding in another court. The title to the $15,000 involved here was being litigated in another proceeding. In the hearing out of which this contempt proceeding evolved, Maurice had testified that he had no interest in the money, did not know where it was located, and did not have access to it or control over it. The petitioner had testified to the same effect, except as to knowledge of its location which she refused to divulge. She explained her position as to Maurice's inability to reach the money very clearly when she asked the court: "Do you think I would give any money to a man—money that belongs to me—could I give it to another man so maybe another woman would get it?" No part of the testimony of these witnesses has been contradicted in any particular. No evidence of any character was offered to show that the money, or any part of it, was in existence at the time of the commitment. It had been drawn from the bank nearly a year previous to the hearing and the presumption would be that it was used in the

ordinary manner in the business of the petitioner, and in living expenses. This presumption would be strengthened by the inference that it was the only money she had for these purposes because all other property of the witness was tied up under legal process. In this proceeding no presumptions can run against the petitioner.

During the course of the inquiry the trial court repeatedly requested counsel for Anna Blache to state in what respect they deemed the inquiry pertinent to the contempt proceedings against Maurice. Their answer was that if they could find where the money was located they might be able to ascertain from the custodian whether Maurice had any interest in it. It does not appear that the trial court was impressed by this explanation, and neither are we, but it seems clear from our examination of the record that the court was convinced that the witness was not telling the truth and should be punished for that reason. The question of the immateriality of the inquiry is not a debatable one. The location of the particular fund was immaterial to the contempt proceeding against Maurice. The issue in that proceeding was whether Maurice had funds sufficient to pay Anna under the alimony award. Petitioner was a party in the divorce action, but not in the contempt proceeding. As a witness in that proceeding she was not required to answer questions which would incriminate or degrade her. She was not required to answer trivial and nonrelevant questions. The petitioner had testified that she had withdrawn the money from the bank and had it in her possession. She claimed title and legal ownership and exclusive right of possession. She was entitled to the presumption that her possession was lawful and based upon ownership. She asked to have this claim adjudicated in a lawful manner and in a proper forum. The only evidence before the court supported her claim of title, ownership, and right of possession. Because of the repeated admonitions of the court that the inquiry appeared to be directed to the purpose of discovering the fund so that counsel might seize it by legal process, the petitioner was fully justified in defending herself against such event. There was no evidence upon which the court could found more than a suspicion that she was falsifying in her testimony in relation to this inquiry. There was no evidence upon which the court could base a finding that the questions put to the witness were

material to the issue then before the court, to wit, whether Maurice was able to pay the alimony award. The right of a witness to refuse to answer a question which is not "pertinent to the matter in issue" may not be denied. (Sec. 2065, Code Civ. Proc.; *Kimball* v. *Superior Court*, 38 Cal. App. 761, 762 [177 Pac. 488]; *Rogers* v. *Superior Court*, 145 Cal. 88, 94 [78 Pac. 344].)

The petitioner is discharged.

Sturtevant, J., concurred.

SPENCE, J., Dissenting.—I dissent.

The main issue before the trial court was whether or not Maurice Blache had the ability to comply with the trial court's order. In support of the contention that he had such ability, it was shown that large real estate holdings of the value of approximately $250,000 and a bank account in a sum in excess of $15,000 had stood for some time in the joint names of said Maurice Blache and petitioner and that said Maurice Blache had purported to transfer to petitioner any interest which he had in said real property and in said bank account at a time when negotiations were pending for a settlement between said Maurice Blache and his wife, Anna Blache. It was claimed that said Maurice Blache still had an interest in said property and in the money which had been withdrawn from bank account and that he still had control over and access to the same. Questions were therefore directed to petitioner to ascertain what she had done with the money which she had withdrawn from said bank account and where the money was located thereafter and at the time of the hearing. In my opinion, the questions relating to the disposition made of the money after it had been withdrawn from the bank were material. The plaintiff was not bound by the mere conclusion of the witness that said Maurice Blache had no interest therein and it was appropriate for the trial court to allow plaintiff the widest latitude in the examination of the witness in order to ascertain all the facts which might throw light upon the issue which the trial court was called upon to determine.

In reply to pertinent questions relating to the disposition and location of the money, petitioner gave purported answers on each of the several days of the hearing. The trial court

was most patient with the witness and continued the hearing from time to time with the advice that she must answer the questions addressed to her on this subject. The nature of the answers given by petitioner to these questions is illustrated by the following which were given at various times: (1) "Why should I tell you?" (2) "I will not tell where I have it. That is my money." (3) "It is in my possession. I would not say where. Why should I say where?" (4) "Well, it is buried under a tree in the country." (5) "I cannot point it from here." (6) "The tree is in the country." (7) "Well, it is in my place in the country." (8) "Well, I don't remember when I buried it because I have to be very careful. It may be a day or two days after I drew it out, I don't remember." (9) "I don't remember saying that I buried the money under a tree. I was too excited that day. I don't remember whether I buried it or not. I might have, I cannot be sure." (10) "I don't remember drawing any money from that bank account." (11) "I am not sure what you mean by a bank account. I would not be sure of anything." (12) "I don't know what I did with the money now. I know I have it somewhere but I don't remember where now." (13) "I won't have anybody asking me those kind of questions."

The foregoing answers are but a few of the contradictory and defiant answers given by the witness upon the numerous hearings. Her first answers were to the effect that the money was in her possession but she absolutely refused to disclose the place where it was located. She was directed to answer and then testified that she had buried the money under a tree in the country. Thereafter she claimed she did not remember so testifying and took refuge in the claim that she did not remember what she had done with the money. During the final hearings, her counsel interposed numerous objections and challenged the right of the trial court to compel her to answer the questions. The trial court overruled the objections and directed the witness to answer whereupon her counsel stated, "I think the witness has several times indicated her purpose not to answer that question". The only reasonable conclusion which can be reached upon a reading of the record is that the statements of the witness to the effect that she did not know or did not remember were mere attempts to evade

696

answering the questions and constituted a refusal to answer said questions.

The trial court made full and complete findings in its order for the warrant of commitment to issue. It was there found, among other things, that the questions were material; that the witness had the ability to answer the same; that the only answers given in response thereto were sham, evasive, false and vague answers; and that the refusal of the witness to answer said questions constituted a wilful and deliberate refusal to answer as a witness. I believe that all of these findings are amply sustained by the evidence and that the trial court was entirely justified in holding petitioner in contempt under the circumstances. A witness may not avoid a charge of contempt by stating, "I do not know" or "I do not remember" when it is apparent that the witness has the ability to answer but refuses to do so. (*In re Stein*, 7 Fed. (2d) 169; *Schleier* v. *United States*, 72 Fed. (2d) 414; *O'Connell* v. *United States*, 40 Fed. (2d) 201; *People* v. *Hanley*, 121 Misc. 624 [202 N. Y. Supp. 87]; *In re Schulman et al.*, 167 Fed. 237; *In re Schulman et al.*, 177 Fed. 191; *Becker* v. *Gerlich*, 72 Misc. 157 [129 N. Y. Supp. 614]; *Haimsohn* v. *United States*, 2 Fed. (2d) 441.)

I find no merit in any of the points raised by petitioner in this proceeding and, in my opinion, the writ should be discharged and the petitioner should be remanded to custody.