In re WEINREB et al.

(Circuit Court of Appeals, Second Circuit. February 26, 1906.)

No. 129.

BANKRUPTCY—CONCEALMENT OF ASSETS—EVIDENCE TO JUSTIFY FINDING.

The indebtedness of bankrupts who were dealers in diamonds and jewelry was about $90,000, all of which had been contracted within the past 15 months. There was a shortage of assets, not satisfactorily accounted for of $60,000, and besides that within 10 days shortly prior to their bankruptcy they drew from the bank on checks $18,200. On their examination they refused to answer questions in respect to such transaction, but later when their discharge was opposed on that ground, testified that they had paid the money drawn for diamonds previously

purchased from a stranger which they suspected to have been smuggled, and that at his request the transaction was not entered on their books, but was shown in a small book kept by them. Such book was not produced and their testimony was wholly uncorroborated. *Held,* that their testimony was not credible, and that the evidence justified a finding that they had concealed the money, and an order requiring them to pay it over to their trustee.

Petition for the Revision of Proceedings of the District Court of the United States for the Southern District of New York.

The following is the opinion of Holt, District Judge, in the court below:

This is a certificate to review an order of the referee, denying a motion that the bankrupts turn over certain money to the trustee. The bankrupts were jewelers and diamond brokers at New York. They had been in business for about eight years before the bankruptcy. They did a business at first of about $20,000 a year. During the year from January, 1902, to December, 1902, the sales aggregated $72,115. During the seven months from January, 1903, to the end of July, 1903, they aggregated $79,601. On August 4, 1903, an involuntary petition was filed and an adjudication in bankruptcy thereafter had. The schedules show liabilities of about $90,000 and nominal assets of about $18,000, from which about $10,000 has been realized. The liabilities shown in the schedules were contracted during the 15 months prior to the filing of the petition. No adequate explanation is given of this large deficiency, and all the circumstances of the case show, in my opinion, that the bankrupts, during the last six months that they continued in business, contemplated a fraudulent bankruptcy. During the period between July 11 and July 20, 1903, the bankrupts drew from the bank cash on checks aggregating $18,200, as follows: July 10th, $3,000; July 11th, $2,000; July 11th, $2,000; July 13th, $2,200; July 13th, $6,000; July 20th, $3,000. On the day after the last check was drawn, Merker, one of the bankrupts, went to Europe, and about a week after Weinreb, the other bankrupt, having heard that proceedings in bankruptcy were contemplated, also left for Europe. After jurisdiction had been obtained by publication of the subpoena, and an adjudication in bankruptcy had, they returned and were examined. On their first examination, when asked as to what had been done with this $18,200 drawn in cash, each of them refused to answer, on the ground that the answer would tend to incriminate and degrade him. Several months later they applied for a discharge, and one of the specifications of objection to discharge was that they had refused to answer material questions. Thereupon the bankrupts appeared before the referee and offered to answer the questions which they had previously refused to answer, and they thereupon testified, in substance, as follows: That Merker, when in Paris, in May or June, 1902, was introduced to a man named Freundlich, by a diamond broker. He does not remember the name of the broker. He does not know the residence, business address or first name of Freundlich. Freundlich told Merker that he would like to do business with him. Merker said that he would buy if the goods were right and reasonable. Freundlich said that he would send a man to him in New York with the goods, and in the package he would find a memorandum of prices. Freundlich said that he sold goods only for cash, that he didn't want any note or receipt, and didn't want his name entered in the bankrupts' books. Merker explained that they were not able to pay cash, and Freundlich thereupon agreed to sell on eight months' credit. Thereafter, in the fall of 1902, a man came to the bankrupts' office. He said that his name was Jackson. The bankrupts did not know where he lived, or where his place of business was, or what his first name was. He brought some diamonds, and said that he represented Mr. Freundlich. The diamonds had inclosed with them a memorandum stating their weight and value. The memorandum had no billhead. The bankrupts purchased the diamonds on eight months' credit. They gave no receipt, note,

or writing of any kind for them. They made no entry of them in their regular books, but say they made an entry in a little book like a bank book, which the receiver did not find and which has never been produced. At the expiration of the eight months, which happened to be during the latter part of July, immediately before the bankruptcy, Jackson appeared at the office and asked to be paid. He objected to checks and wanted cash, and thereupon both bankrupts drew the checks in question and went to the bank and drew the cash and gave it to Jackson. Jackson gave them no receipt or paper of any kind. One of the bankrupts admitted that he suspected that these goods had been smuggled, and their claim is substantially that that fact was the explanation of the circumstances under which these goods were bought and paid for.

This story is extremely improbable. Of course, smuggled goods may be purchased, and, if purchased, the acts of the parties engaged in such a business are frequently stealthy and furtive. But if that is the explanation of the circumstances of this purchase, it is not enough for the bankrupts to simply say so. Their story, if true, could be corroborated in various ways. But it is entirely uncorroborated. It is precisely the kind of story which bankrupts would tell, who had been engaged in the diamond business, and had been planning a fraudulent bankruptcy, and had drawn $18,000 in cash just before their bankruptcy, for the purpose of concealing it from their creditors. I cannot avoid the conclusion that their story is an entire fabrication, and that the bankrupts have this money concealed from their creditors, and that they should be ordered to pay it to the trustee.

There is, besides the sum of $18,200 which they drew out in cash, a deficiency of assets amounting to about $60,000. The only explanation of the disappearance of this large amount given by the bankrupts is that losses arose from bad judgment in buying and then selling at a sacrifice to pay pressing debts. They assert that at the end of each year they found they had lost money. This explanation is very unsatisfactory, but perhaps it is not impossible. I strongly suspect that the bankrupts have a large part of this deficiency hidden somewhere; but I think, upon the whole, that the proof that they have it is not sufficient to justify an order that they pay it over. An order may be entered directing them to pay to the trustee $18,200.

Joseph Fried, for petitioners.

Joseph Rosenzweig, for respondent.

Before LACOMBE and COXE, Circuit Judges.

PER CURIAM. Order affirmed on the opinion of the District Court.